Date signed October 28, 2006



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

IN RE:                                          :
                                                :
KORA & WILLIAMS CORP.                           :       Case No. 88-41402PM
d/b/a CORMAC CONSTRUCTION CORP.                 :              Chapter 7
                                                :
                  Debtor                        :
- - - - - - - - - - - - - - - - - - - - - - - - :

### MEMORANDUM OF DECISION

Before the court are the objections to the amended proof of claim (No. 80) filed by

Insurance Company of North America ("INA") on December 20, 2001, in the sum of

$10,763,826.64, now reduced to $10,670,289.73.  The objecting parties are William B. Sullivan,

Chapter 7 trustee of the bankruptcy estate of Kora & Williams Corporation (sometimes "K&W"

or "Debtor"), and Ira Steinberg, in his capacity as an unsecured creditor as well as the sole owner

of the corporate stock of the Debtor (the "Objectors").[1]

Background Discussion

The history of this case and the unexpected events that lead the court to the issue before it

can be found in the chronologies set forth in Judge Titus's opinion dealing with a portion of the

objections concerning the attorneys' fees claimed by INA, *Ins. Co. of N. Am. v. Sullivan*, RWT

---

[1] Ordinarily a Chapter 7 debtor lacks standing to object to claims and fee allowances, for lack of a pecuniary interest.  *In re Willemain*, 764 F.2d 1019, 1022-23 (CA4 1985).  Inasmuch as this is a solvent estate, the Debtor has standing to join in this proceeding.

-1-

04–CV-2805, Docket Entry No. 29, entered September 29, 2005, and this court's opinion on the same issue, Docket Entry No. 506, entered June 8, 2004. As noted in those opinions, the District of Columbia litigation produced an extraordinary and wholly unanticipated result for the Debtor and INA – a total victory in that the June 19, 1987, default termination of a bonded construction contract (the "Union Station Contract") by the District of Columbia was converted to a termination for the convenience of the District of Columbia. *See, District of Columbia v. Kora & Williams Corp. and Ins. Co. of N. Am.*, 743 A.2d 682 (DC 1999).[2] The result of the Union Station litigation was an award of total job costs of $12,410,991.00 plus interest at four percent per annum to K&W and its surety, INA. The amount subsequently paid by the District of Columbia was $18,497,310.76.

In the nineteen years since the termination of the Union Station Contract, and the attendant loss of K&W's bonding capacity, memories have dimmed with regard to the events surrounding the completion of K&W's bonded jobs by INA. Regrettably, some of the records of INA have been destroyed.[3] The destroyed records would have simplified the determination of one aspect of the objection, namely the accounting of funds paid into and out of what has been described as the Provident Bank Trust Account. The court also concludes that, had there been the slightest anticipation of the possibility of a surplus in this bankruptcy case under Chapter 7, the trustee in Mr. Steinberg's individual bankruptcy case filed under Chapter 7 on April 29, 1993, in the United States Bankruptcy Court for the Virgin Islands, Case No. 393-00018, would not have reported a "no-asset" case. Thus, the surplus distribution after payment of all creditors in this case goes to the sole shareholder of the Debtor, Mr. Steinberg, and not to his creditors. Payment to Mr. Steinberg results under the operation of 11 U.S.C. § 554(c), whereby property that is scheduled but not administered at the time of the closing of a case filed under Chapter 7 is abandoned to the Debtor.

---

[2] Elsewhere in this opinion, the court may refer to this litigation as the Union Station litigation.

[3] The court is appreciative of the Stipulations among the parties (Docket Entry No. 745) that aided the court in the trial of this matter with one exception that is discussed later in this opinion.

-2-

The objections before the court are essentially challenges to certain expenses and expenditures incurred by INA in its capacity as the surety assuming the obligations of its principal, K&W. The challenged expenses and expenditures relate to the work allegedly necessary to complete certain government construction contracts for K&W on projects in the District of Columbia and nearby Maryland. The rule for resolution of this dispute was modified by the decision of the Court of Appeals of Maryland in the case of *Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co.*, 844 A.2d 460 (Md. 2004). Prior to the Court of Appeals' decision in *Ulico*, a principal's only basis for challenge to the payment of expenditures by its surety was whether the surety had made the payment for which it sought reimbursement in good faith. This was the holding of the Court of Special Appeals of Maryland that was reversed. *Ulico Cas. Co. v. Atlantic Contracting & Material Co., Inc.*, 822 A.2d 1257, 1266-1270 (Md. App. 2003). But for the decision of the Court of Appeals in *Ulico*, the outcome of this case would have been guided by prior state law and the opinion of the Fourth Circuit in *Fid. & Deposit Co. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163-1164 (CA4 1983) ("The only exception to this provision [for reimbursement of the surety] arises when the payment has been made 'through fraud or lack of good faith' on the part of the surety but any challenge to such payment must be rested solely on that claim of bad faith or fraud." (quoting *Engbrock v. Fed. Ins. Co.*, 370 F.2d 784, 786 (CA5 1967)).[4] To use the vernacular, the rules changed long after the game was completed.

In *Ulico*, the Maryland Court of Appeals opened the window further for challenge to a surety's claims for reimbursement on behalf of bonded principals. The court held that,

> [I]f a surety *unreasonably* pays for an obligee's work that is not covered under a payment bond, then the surety should not be entitled to indemnification from the principal without further ado, under the good faith provision in the indemnity agreement.

844 A.2d at 475 (emphasis added). The court added this rule of reason,

---

[4]  The court finds no basis whatsoever for the imputation of fraud or bad faith on the part of INA in making the outlays for the expenses for which reimbursement is claimed.

> [O]nly to filter the most egregious, careless, or inattentive conduct, short of fraud,
> of a surety; such as making a payment on a bond that the surety clearly knows or
> should know is not covered by the bond.

*Id*. at 477.  The court also noted that,

> [W]e do not substitute a reasonableness standard for the good faith standard; we
> simply have equated the two standards . . . . We hold that the good faith standard
> allows the surety a discretion limited by the bounds of reasonableness, rather than
> by the bounds of fraud.

*Id*. at 473-44 (citation omitted).  In determining whether a surety made a reasonably good faith settlement under the terms of the bond and indemnity agreement, the court is instructed to consider:

1.      The obligations of the surety as provided by the terms and coverage of the bond;

2.      Whether the principal has made more than generalized demands that the surety deny the claim;

3.      The cooperation, or lack thereof, by the principal in dealing with the surety; and

4.      The thoroughness of the investigation performed by the surety.

*Id.* at 474 (citations omitted).

Applying these principles to this case, the court finds that all of the work done by INA was in its capacity as surety as required by the terms of its bond and not as a volunteer.  Here, the principal never made a specific demand but appeared years later, in the spirit of a Monday morning quarterback, challenging whether the payments should have been made in the first place.  Nothing in this voluminous record leads the court to conclude that there was ever one specific demand made on behalf of K&W to INA not to make any particular payment.  Mr. Steinberg explains that the reason for this is that, for the most part, he and his staff were kept out of the loop and were unaware of the payments to the subcontractors and suppliers.  The court finds this believable, in part, because of the fact that he had no standing and appeared to be "out of the money."  *See generally, In re Willemain*, 764 F.2d 1019 (CA4 1985).  Mr. Steinberg left the Metropolitan Washington area in January 1989, after INA took over K&W's bonded projects, moving to his home in the Virgin Islands.  He came back to the mainland every few

-4-

months and, while he testified that he was always available to help INA, a lack of interest on his part at the time would be hardly surprising in that the ultimate result was as unlikely to forecast as it was. But the court finds nothing to show that the principal and his staff were anything less than completely cooperative in meeting the requests of the surety. The court finds that the investigation by the surety was as thorough as one would expect under the circumstances presented. When INA stepped into the shoes of the contractor, its primary task was to stem the bleeding and finish the bonded jobs. It was a classic exercise in damage control. The Debtor lagged far behind its required completion dates for the Andrews and Walker House Projects, and probably INA was not looking at Mr. Steinberg as a possible source of reimbursement. INA's agenda in 1988 and 1989 had to be that of closing out the jobs in the most economical method possible.

<u>Issues Before the Court</u>

The court will address the specific issues raised in the claims objections. As explained in the Joint Pretrial Statement filed by the Trustee and Mr. Steinberg, Docket Entry No. 702, a number of the particulars of the objections to the proof of claim have been abandoned. Some other aspects of the objections have been overruled or sustained by previous rulings of this court. The parties stipulated to facts disposing of a number of issues. The First Set of Stipulations appears in the record at Docket Entry No. 745.[5] While the proof of claim was filed as a secured claim, in paragraph 11 of the Stipulation, INA agreed that its claim before the court is an unsecured claim without priority. The following issues remained for decision:

1. *Objection to claimed legal fees and expenses incurred by INA after May 16, 1988, for prosecuting the default termination of K&W on the Union Station Contract.* The Order sustaining the objection was affirmed by the Order of the District Court. There remains to be determined the amount of fees allowable to INA for work on the Union Station Project <u>not</u> related to the appeal to the Contract Appeals Board. This is the subject of paragraph 10, below, and the remarks of the court at the end of this Memorandum.

---

[5]A second set of Stipulations that would have materially assisted the court in the resolution of a significant part of this dispute appears in the record as INA Exhibit No. 263. While it was used by the parties during the trial, the Stipulation was never executed, and its status caused the problem described by the court later in this opinion.

2. *Objection based upon the failure of INA to credit the entire amount of its $22.7 million recovery from the District of Columbia against the total of bond losses and expenses.* More precisely, this objection relates to how INA booked the interest received from the District of Columbia on the refund of the performance bond settlement. The Objectors argue that the interest portion of the payment made by the District of Columbia on the refunded performance bond should be credited to the Debtor and used to reduce the amount of the INA claim. This objection was overruled at the conclusion of the evidence presented by the Objectors at the March 20, 2006, hearing. The court's findings of fact and conclusions of law were stated on the record in open court.

3. *Objection based upon the failure of INA to include a credit for the sum of $92,500.00 recovered by INA from the project owners that was credited to the Provident Bank Trust Account and thereafter used to pay the Trustee in settlement of a preference action.* INA conceded in the First Set of Stipulations that its claim must be reduced in the amount of $92,500.00 on account of this payment in settlement of the Trustee's preference action that was made from the "trust account."

4. *Objection based on the inclusion of a credit for $162,965.96 for money owed on the Walker House Project caused by INA wrongfully acceding to the owner's setoff claim for liquidated damages for late charges.* This aspect of the objection is aided by the new *Ulico* standard. It involves the allegations that Mr. Steinberg and the Trustee were not consulted at the time that this contract was closed out. The objection asserts that the majority of the liquidated damages would have been avoided had INA availed itself of the defenses held by the Debtor and that no effort was made to contact Mr. Steinberg relative to this claim. This was material because, as Mr. Steinberg testified, K&W never had to pay liquidated damages on any prior contract, largely because of its superior organizational skills in marshaling defenses to such claims. Other defenses are suggested, such as the cost of change orders and the failure of the project owner to put K&W on notice of its intent to assess liquidated damages.

5. *Objection based upon the inclusion for credit of $73,304.00 for money owed on the Andrews Air Force Base Project caused by INA wrongfully acceding to the owner's setoff claim for liquidated damages for late charges.* The testimony consisted of numerous examples of delays attributable to the misconduct of the owner. The Objectors identified various situations

attributable to the owner that delayed performance.  Agents of the Debtor offered assistance to INA in an effort to obtain credits and minimize late charges, and the assistance was said to have been rejected.  The Objectors argue that, by acceding to unwarranted late charges, INA did not act reasonably in closing out the contract.

6. *Objection based upon the payment of $37,000.00 paid to Hartcam Construction, a mechanical subcontractor, on the Andrews Air Force Base Project.*  The Objectors state that Hartcam Construction was terminated for non-performance and that the payment of $37,000.00 in additional compensation was unreasonable and should not form a part of INA's allowed claim.

7. *Objection based upon the payment of $31,617.86 to Billings & Birckhead and R.M. Thornton to complete work encompassed within the Debtor's subcontract with EFX, Inc.*  The Objectors urge that this expense was unnecessary and unreasonable, and Mr. Steinberg testified that, had he been on the job and in control, he would have been able to arrange completion by the subcontractor without additional expense.

8. *Objection based upon the destruction of records by INA of the Provident Bank Trust Account used to collect funds due K&W from the owners of the bonded jobs that were completed by INA.*  There is an almost total lack of documentation of the payments made from this account by INA to the suppliers and subcontractors on the bonded jobs.

9. *Objection by Mr. Steinberg as to what he terms is the failure to account for a payment of $70,000.00 from the Walker House Project.*  This objection deals with the lack of evidence linking this payment to the reimbursement claim.  If there is no connection between the two, the claim must be reduced in this amount.

10. *Objection to the reasonableness of the fees charged INA by its counsel and contractors.*  This objection goes across the board as to all projects and pertains to claims for reimbursement of attorney's fees and expenses, deposition fees and court costs, consultants' fees and expert witness fees. The Trustee urges that a request for legal fees in connection with a surety's claim must be supported by a showing that it is subject to the same "lodestar" analysis as any fee application.  The Objectors claim as well that some of the fees and expenses described at the March 20, 2006, hearing for which compensation is sought are related to the Contract Appeals Board appeal and therefore may not be allowed pursuant to this court's ruling on the

-7-

issue defined in paragraph 1, above.  The court has had considerable difficulty in determining the length and breadth of this dispute.

At the conclusion of the Objectors' case, INA moved to dismiss the objection pursuant to Fed. R. Civ. P. 52(c) that is made applicable to this contested matter by Fed. R. Bankr. P. 7052(c) and 9014(c).  The court granted the motion in part, after having heard all the evidence of the Objectors, and stated its findings and conclusions on the record in open court.  This ruling dealt with the matters described in paragraphs 1, 2, 7 and  9, above.  Specifically, the court found that the Debtor's estate is not entitled to any credit against INA's amended proof of claim on account of the recovery of its performance bond payment and the interest paid thereon by the District of Columbia following the resolution of the dispute before the Contract Appeals Board of the District of Columbia and appeal to the District of Columbia Court of Appeals.  The court also found that the Objectors failed to carry their burden of proof as to that part of their objection that dealt with reimbursement for payments made to Billings & Birckhead and R.M. Thornton for work that was encompassed within the Debtor's subcontract with EFX, Inc. on the Pentagon Project.

Findings and Conclusions

As a result of this ruling and the Stipulation, the issues described in paragraphs 4, 5, 6, 8, 9 and 10 remain for decision.  With respect to the Provident Bank Trust Account transaction (described in paragraph 8), the court finds that the Trustee was under no obligation to procure either copies of the records of that account from INA or from Provident Bank upon learning of the existence of the account.  These records were the responsibility of INA to maintain, and it alone must bear the burden of their destruction.  Likewise, the court notes that there is no allegation that these records were destroyed purposefully in order to improve the position of INA in this litigation.  Had Richard England, a regional line manager of heavy bond losses, not retired when he did, and had the Wilmington office of the bonding company not been merged into its Philadelphia office, these records most likely would have remained available for discovery and trial.  But, the complete record that INA contends would show its receipts and expenditures to the penny with regard to the finishing of the bonded projects is not before the court, although copies of documents consisting of a portion of the record are available.  On account of this

-8-

spoliation of the evidence, the Trustee argues that INA's claim should be reduced by the total of the disbursements from the account for which INA could not produce documentation.

The Trustee called Raymond Peroutka, a forensic accountant, as an expert witness to quantify the amount of INA's unverified expenditures. The witness had the benefit of hearing earlier testimony and because of this was able to correct some errors in his report and supplemental report. The figure that he ultimately reached was $475,300.00 in "unaccounted for funds." Mr. Peroutka concluded largely, because one check had been made payable to the Trustee and not used on account of the bonded projects, that INA had failed to demonstrate that it had properly accounted for the contract proceeds received from the owners, and thus it would follow that the claim of INA should be reduced in that amount. His testimony was offered as a counterweight to that of Patrick Andrew McGeehin, the forensic accountant testifying on behalf of INA. INA's expert testified that he was comfortable with the control environment used by INA as to the Provident Bank Trust Account (*i.e.*, the requirement of dual signatures on the Provident Bank checks), the experience that he had had in dealing with Mr. England, the primary signatory who kept the checks and deposit slips for the account under lock and key, the correlation of the bank statements with the EIS reports in the home office, and the unannounced home office audits. He testified that with the exception of the $92,500.00 preference payment (described in paragraph 3, above), there was no basis to challenge the proposition that the Provident Bank Trust Account was used for any purpose other than for the completion of the project, as testified to by Mr. England.

In the absence of the missing checks, bank statements and invoices, the court cannot find to an absolute certainty that the money was spent as claimed by INA, the party responsible for the destruction of the records. Where does that leave the court? Spoliation is a principle of evidence first applied in admiralty in the earliest days of the Republic. *The Pizarro*, 15 U.S. 227 (1817); JAMES KENT, *Commentaries on American Law,* vol.I, 157 (2d. ed. 1832). In recent times, as Judge Breyer, now Justice Breyer, noted in *Nation-Wide Check Corp. v. Forest Hills Distrib., Inc.*, 692 F.2d 214, 218 (CA1 1982), the doctrine is nothing more than the application of the common sense observation that a party with knowledge of a document that is relevant to litigation who proceeds to destroy it is more likely to be threatened by it. The court adopts the

reasoning of *Martin v. Intex Recreational Corp.*, 858 F. Supp. 161, 163 (D. Kan. 1994). There it was said that spoliation of evidence:

> . . . occurs along a continuum of fault, ranging from innocence through degrees of negligence to intentionality. The resulting penalties vary accordingly, and can range from no adverse evidentiary consequences for destruction of evidence that is unintentional or is satisfactorily explained, through inferences, presumptions and burdens that can be imposed by court, on to separate causes of action against intentional spoliators.

*See also, Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (CA4 2001) (The court must find some degree of fault to impose sanctions.). The inferences drawn from spoliation are derived from the need to preserve the integrity of the judicial process. *Id.* In Maryland, spoliation does not give rise to an independent cause of action. *Goin v. Shoppers Food Warehouse Corp.*, 890 A.2d 894, 897-98 (Md. App. 2006), *cert. denied*, 898 A.2d 1004 (Md. 2006).

In this situation, INA met the burden of going forward. *See, Miller v. Montgomery County*, 494 A.2d 761, 768 (Md. App. 1985), *cert. denied*, 498 A.2d 1185 (1985); *DiLeo v. Nugent*, 592 A.2d 1126, 1131-32 (Md. App. 1991). Under Maryland law, the presumption that arises from the spoliation of evidence is rebuttable and is not a surrogate for presenting evidence in opposition to a claim. *Anderson v. Litzenberg*, 694 A.2d 150, 157 (Md. App. 1997). When the opposing party presents evidence on the other side of the issue, all the presumption does is to enhance the probative value of the evidence presented. *Id.*

The inference to be made depends upon the intent or motive of the party who is responsible for the destruction. "Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable, but would not in itself amount to substantive proof that the evidence was unfavorable." *DiLeo*, 592 A.2d at 1132 (*citing, Miller*, 494 A.2d at 768). While a finding of bad faith is sufficient to permit the trier of fact to draw an adverse inference from a party's destruction of evidence, such a finding is not always necessary. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (CA4 1995) (citation omitted); *see also, Anderson*, 694 A.2d at 156 n.2 (listing authorities pro and con on the requirement of showing bad faith as a prerequisite for drawing a negative inference against the spoliators). In *Vodusek*, parts of a cabin cruiser were destroyed by plaintiff's expert in the course of an examination in preparation for trial. 71 F.3d at 154. The Court of Appeals

-10-

approved the trial court's instruction that the jury could draw an adverse inference from those facts. *Id.* at 156-57.

A pithy summary of the applicable legal principles is found in the Maryland Civil Pattern Jury Instructions, Fourth Edition with 2006 Supplement, as published by the Maryland Institute for the Continuing Professional Education of Lawyers, Inc.:

### SPOLIATION

> The destruction of or the failure to preserve evidence by a party may give rise to an inference unfavorable to that party. If you find that the intent was to conceal the evidence, the destruction or failure to preserve must be inferred to indicate that the party believes that his or her case is weak and that he or she would not prevail if the evidence was preserved. If you find that the destruction or failure to preserve the evidence was negligent, you may, but are not required to, infer that the evidence, if preserved, would have been unfavorable to that party.

MPJI-Cv 1:8 at 134.

Having said this, it still must be remembered that the burden of proof remains upon INA. Here, unlike *Nation-Wide Check Corp.*, 692 F.2d at 219 (CA1 1982), the court finds that the Provident Bank documents were not destroyed at the instance of an individual with knowledge of their materiality. The court finds no culpable state of mind on the part of agents of INA, as in *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 110-111 (CA2 2001). INA's failure to preserve the records was negligent, not intentional, as is conceded by the Trustee. This leaves the court with the decision of what inference may be drawn from this record. Considering the totality of the control environment used by INA, in particular the requirement of dual signatures, the home office audit, the uncontradicted accuracy of the accounting of funds disbursed from the home office account by some 3,900 checks, as well as the court's observation of Mr. England during his long tenure as a witness, the fact that the checks in question were kept under lock and key by Mr. England, and the fact that he drew virtually every check on this account, the court concludes that, other than for the exception noted, the funds from this account were spent for the completion of the bonded projects and for no other purpose. Likewise, the court finds that the project receipts from the applicable period were deposited into this account. The court finds nothing in this record to suggest anything other than the conclusion that all funds received during the period in question were deposited in the Provident Bank Trust Account and all disbursements

-11-

from that account, with a single exception, were made for expenses of the bonded projects. At the time, there was not the slightest expectation of the favorable outcome of the litigation. The court finds as a fact that INA's employees considered that they were spending INA's money and were not on a frolic with K&W funds. The court finds from the secondary evidence offered by INA that the inference compels no finding favorable to the Trustee. Another factor supporting this conclusion is the record with respect to some 3,900 EIS payments made from the home office that the Trustee once challenged and now concedes that he no longer has any objection to. The court declines to infer that the destroyed records would cause a different conclusion in whole or in part.

It is conceded by all parties that INA completed the Debtor's performance of the contracts on the bonded jobs. INA used many of the K&W subcontractors to complete the bonded projects. Payments to the subcontractors and suppliers are not reflected on the EIS reports. Some entity paid these bills. The most logical conclusion is that the bills were paid out of the Provident Bank Trust Account. The court accepts the opinion of Mr. McGeehin that the payments could only have come from the Provident Bank Trust Account. The court gives no weight to the opinion of Mr. Peroutka that the Provident Bank Trust Account was used for any other purpose. On the other hand, the failure to produce the Provident Bank Trust Account records caused the Trustee to spend time and effort to fulfill his fiduciary duty. The court estimates that an appropriate allowance in these circumstances, or "haircut" as described by counsel for INA in his final argument for the failure to preserve these records, is a $27,500.00 reduction of the claim.

The allegations by the Trustee and Mr. Steinberg as to the "unreasonable" payments and acceptance of late charges at the end of the projects, as described in paragraphs 4, 5 and 6, likewise do not compel a reduction in the claim of INA. In the first instance, the court finds, as stated above, that INA believed that it was spending its own money at the time that these payments were made and that there was little likelihood of the recovery ultimately obtained that would make the situation otherwise. Second, the Agreement of Indemnity under which the parties were bound provided as follows:

> [T]he Principal and Indemnitors further agree that in any accounting between the Surety and the Principal, or between the Surety and the Indemnitors, or either or

-12-

> both of them, the Surety shall be entitled to charge for any and all disbursements
> made by it in good faith in and about the matters herein contemplated by this
> Agreement under the belief that it is or was liable for the sums and amounts so
> disbursed, or that it was necessary or expedient to make such disbursements,
> *whether or not such liability, necessity or expediency existed* . . . . (emphasis
> added).

While the court finds that there are several areas where the surety's acceptance of late charges or settlements with the owners could be subject to second-guessing, there is nothing to support a contention that the surety made any payment other than in the honest belief either that the sum was due or that the payment represented a reasonable and expedient resolution of a dispute made after a good faith investigation.  Under the terms of the Indemnity Agreement, INA was not required to show more.  The fact that K&W had never in its history paid late charges on a contract is immaterial.  It never before was a debtor in a bankruptcy case under Chapter 7, nor does it appear that a surety was ever required to complete a job for it.  The court finds that INA's investigation of the claims was reasonable, although not flawless.  INA used the resources of the records of the Debtor and the personnel available to it.  No other conclusion can be reached other than INA completed the bonded jobs in good faith, and its discretion was exercised reasonably.[6] The court finds that the failure to consult Mr. Steinberg is of little significance in that, at the relevant times, he was at his home in the Virgin Islands, and nothing prevented him from pressing his views upon the surety's representatives were he so inclined to do so at the time.

As described in paragraph 9, Mr. Steinberg urges that there is no showing that one check in the sum of $70,000.00 is related to the contract balance.  Specifically, Mr. Steinberg points at INA Exhibit No. 216, Bates No. 0002384, a check dated October 30, 1987, payable to Greater Southeast Community Center for the Aging, and questions how this sum was ever credited to the Walker House Project Contract balance.  Of all the issues presented in this dispute, the court finds the factual record underlying this dispute the least helpful.  Based upon the record, the

---

[6] In *Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp.*, 975 F. Supp. 511, 516 (S.D.N.Y. 1997), quoted with approval by the Court of Appeals in *Ulico*, *infra*, Judge Sweet explained in words equally applicable to this case: "[s]ureties enjoy such discretion to settle claims because of the important function they serve in the construction industry, and because the economic incentives motivating them are a sufficient safeguard against payment of invalid claims."

-13-

court finds that there could have been no possible relationship between the hospital and the Walker House Project. If there is an explanation for this anomaly, the court does not have the benefit of it. The objection to this portion of the claim will be sustained.

The settlement of the Hartcam Construction claim for $37,000.00 is attacked as unreasonable and being made without a thorough investigation. The court finds that the payment was a reasonable settlement of a disputed claim, considering the costs and risks of litigation. It is notable that Mr. Steinberg objected to this payment before he examined the Hartcam Construction file. Likewise, the record reflects that the entire subcontractor file for Hartcam Construction was turned over to counsel for the Objectors. (Tr. 3/3/2006 at p. 26). Nothing from that file was presented in support of the objection. Previously, Mr. Steinberg strongly supported the $37,000.00 claim by Hartcam Construction against the owner following its performance of fan coil work, for which it was not paid. (Tr. 01/20/2006 at p. 85, "We strongly agree that your position that the drawings are defective and misleading."). His assertion of a counterclaim, because payments were made to Hartcam Construction subcontractors after its termination, is unsupported. To the contrary, the court finds credible the testimony of Mr. England that INA used subcontractors for several tasks. (Tr. 3/3/2006 at pp. 24-5). The fact that payments were made to Hartcam Construction subcontractors and suppliers after Hartcam Construction was dismissed does not lead to a finding that these post-termination payments were for Hartcam Construction's work and the possible subject of a counterclaim. The court finds that the settlement of the $218,000.00 Hartcam Construction claim for $37,000.00 was reasonable and expedient.

The Objectors attack the decisions of INA in closing out the Walker House and Andrews Air Force Base Projects for unreasonable acceptance of owner's setoff claims of $162,965.96 and $73,304.00, respectively, and submit that the INA claims should be reduced in those amounts. The Trustee points out that the indemnity agreement's good faith provisions apply only to payments and not to credits such as acceptance of liquidated damage claims and other setoffs. The court finds this a distinction without a difference. With respect to the Walker House Project, the Trustee argues that the acceptance of a liquidated damage claim was not a settlement of a per diem claim of $287,969.20 for the lesser sum, but rather a complete surrender as to a liquidated claim in the maximum amount allowable under the contract. This is demonstrated by

-14-

Article 2 C. of the Construction Contract, INA Exhibit No. 215, as well as the correspondence from the owner's accountant in the same Exhibit. "Our calculations indicate that the second method [actual cost of interest, taxes, insurance and mortgage insurance premium"] results in a lower amount and therefore, was [the] method used in our cost certification." See INA Exhibit No. 215.

The negotiations with the owner's attorney were handled by Mr. England. He was quite proud of his work. As he explained, "[w]hile the Walker House Project was a per diem contract, we were able through the negotiations and persuasions to have HUD apply an actual damages, which was time and interest on their money for the extended time that Walker House was not open . . . ." (Tr. 3/1/2006 at pp. 63-4). But Mr. England was 100% wrong in his understanding of the contract. This leaves the court with the issue of determining how much he gave up for his client and the principal because of this misapprehension of the contract terms. What arrows did he have in his quiver that were surrendered for this phantom concession of $125,003.24? INA's agents had another misapprehension with respect to this particular contract, this being the definition of the date of substantial completion for the purpose of determining whether liquidated damages were available. One view by Mr. England, upon which he may have relied in his negotiations with the owner, was that the date of substantial completion under the contract was the date that the owner takes possession of the property for its intended purpose. This was based upon his experience of handling literally thousands of negotiations dealing with liquidated damages on bonded jobs. (Tr. 3/2/06 at pp. 8-9). Likewise, INA's representative on the ground for this project and two other projects, Michael L. Carlin of S. T. Hudson, the man designated by Mr. England to wrap the projects up for INA and to be his eyes and ears in the field (Tr. 3/1/2006) testified that the time of substantial completion was when the project was ready to be turned over to the owner, other than for punch list items. (Tr. 2/28/2006 at p. 95). Here again, these individuals erred by relying on their experience in the field as opposed to reading the applicable contract. Had they done so, they would have seen that the date of substantial completion is the date "the HUD representative signs the HUD Representative's Trip Report provided that the Trip Report is subsequently endorsed by the Chief Architect." INA Exhibit No. 215, Article 2D. The record does not reflect when, if ever, the field representative's Report was approved by the chief architect. All that is known is that the project was finally closed out.

INA asserts that the burden is on the Trustee to establish the date that the Trip Report was signed. For the purposes of liquidated damages, to the extent that date is material, INA agreed to the cutoff date as February 28, 1989. The Trustee urges that the owner had started occupying the premises substantially earlier and had held an open house reception at Walker House on October 1988. (Tr. 3/2/2006 at pp. 9-14). The owner then had access to the office, the lower level, public restrooms and a kind of meeting room. K&W's Project Manager, Brian Garnant, testified that the open house was held in October 1988, and that the project was substantially complete. Punch list items were undone, but the delays were said to be largely because the owner's representatives were not forthcoming with producing architectural drawings or punch lists timely. (Tr. 1/19/2006 at pp. 40-4). The court disagrees with the argument of INA that the owner was "under no obligation to perform a cost analysis at all" (Reply Brief of INA, Docket Entry No. 759-1 at p. 14) as that obligation was spelled out clearly in the Contract. Because the court remains in the dark as to the date of substantial completion, the court must work from the date of scheduled completion. Based on the record, the issue of delay is likewise uncertain, but the court finds as a fact, as Mr. Garnant testified, that the inaccuracy of the drawings caused delays that should have been the subject of *bona fide* claims for abatement of penalties. However, the fact that K&W had to work over three winters, rather than two as planned, is unfortunate but not compensable. All in all, the court finds that the claim as to the Walker House Project should be reduced by $37,500.00 because of the failure of INA to act reasonably to avail itself of the opportunities afforded by the delays caused by the owner.

The Andrews Air Force Base Project presents a clearer record. Here, INA agreed to settle a claim for damage allegedly caused by K&W to the roof of the project for $150,000.00 and a liquidated damage claim exceeding $650,000.00 for $73,000.00. The Settlement Agreement appears in the record in INA Exhibit No. 236, Bates No. 017802. While the Trustee was a party to the Agreement dated December 30, 2001, he reserved all rights against INA, such as those in this objection. Unquestionably, K&W was entitled to relief on account of the "wardrobe problem," steel delays, composite panel problems and metal roofing problems. The court finds that INA acted reasonably in marshaling its defenses, here using Mr. Garnant, Glen White and others, including Mr. Steinberg, to minimize this claim against the surety. The reduction of a claim in excess of $800,000.00 to $73,000.00 is not something to be brushed

-16-

aside. Perhaps had Mr. Steinberg been in control of negotiations he may have gotten a better result after expensive litigation, but the court can only speculate as to that result.

      The Trustee challenges the reasonableness of the legal fees and related expenses aggregating $6,145,602.48 that pertain to "reimbursement of legal fees and expenses (including, but not limited to, attorney's fees and expenses, expert witness fees and expenses, consultant fees and expenses, deposition expenses and court costs) incurred by INA after May 16, 1988, for prosecuting the appeal of the default termination of K&W on the Union Station Contract . . . ," *Ins. Co. of N. Am. v. Sullivan*, 333 B R 55, 68 (D. Md 2005), as well as fees charged in connection with the completion of other bonded projects. Like claims of oversecured creditors for legal fees, the surety's claims are tested for reasonableness. *Cf., In re Ward*, 190 B R 242, 244-245 (Bankr. D. Md. 1995). The court regrets that the formal Stipulation described below by the Trustee never materialized:

> . . . I believe that during the course of discovery, a great percentage of the legal fees and expenses had been identified and effectively agreed upon, although we do not have a formal stipulation to that effect.
>
> I think that there are still unresolved issues concerning whether certain expenses that were incurred fit within the definition of legal fees and expenses and that is particularly with respect to consultants and experts and whether their efforts were to further the legal proceedings or whether they were non-legal in nature.

Tr. 1/27/06 at pp. 6-7.

A copy of the unsigned Stipulation appears in the record as INA Exhibit No. 263. The parties referred to this exhibit several times in the course of the hearing. The court will now deal with the unresolved issues.

      The fees claimed by INA are recapitulated in the Post-Trial Brief of INA (Docket Entry No. 745, pp. 21-3) and the accompanying Schedules. The components of the claim aside from the post-petition Union Station Appeal fees[7] are:

      A.  Pre-Petition Union Station Appeal Legal Fees       $  163,519.19

---

    [7]  This aspect of the case was determined by an earlier Order from which an appeal was taken. *Steinberg v. Watt, Tieder, Hoffar & FitzGerald*, 348 B.R. 52 (D. Md. 2006).

| | | |
|---|---|---|
| B.  Union Station Legal Fees Not related to appeal | $ | 268,929.13 |
| C.  Same - costs | $ | 19,114.56 |
| D.  C.P.A. Costs Union Station | $ | 95,409.55 |
| E.  Landover WMATA legal fees | $ | 62,251.70 |
| F.  Same - related litigation expenses | $ | 23,770.61 |

The court is under the impression that there is no controversy as to whether these sums were paid by INA.  The objections to the claim for reimbursement of these sums are based upon the proposition that INA failed to prove that these sums were reasonable.  The argument made is that sureties seeking reimbursement for fees and expenses are held to the same high standard of documentation as professionals employed by a trustee or debtor-in-possession.  (Post-Trial Brief of Chapter 7 Trustee, Docket Entry 755, p. 3.)  Such persons are employed pursuant to 11 U.S.C. §§ 327 and 1103.  As such, it is argued, INA must support its claim with billing statements showing the reasonableness of the expenditures that conform essentially to the Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland that appears as Appendix D to the Local Rules of this court.  The Guidelines apply to fee applications to all professionals seeking compensation pursuant to 11 U.S.C. §§ 327, 328, 330 and 331, and require the "lodestar" analysis and discussion of factors originally identified in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (CA5 1974), and adopted by the Fourth Circuit in several cases including *Harman v. Levin,* 772 F2d 1150, 1152 (CA4 1985).  It is true that this court in the case of *In re Ward*, 190 B.R. 242 (Bankr. D. Md. 1995), relied upon 11 U.S.C. § 506(b) and held an oversecured creditor to this standard.  However, the court sees a distinction between the situation of an oversecured creditor and a surety seeking reimbursement from a solvent estate.  The court finds cause for this distinction in the principles described by Judge Sweet in *General Accident Ins. Co. of America v. Merritt-Meridian Constr. Corp.*, 975 F.Supp. 511 (S.D.N.Y 1997), cited at footnote 6.  But this does not end the discussion, as the court must still find that it was reasonable to incur the charges.  At this point, it is useful to review the allocation of the burden of proof.  The rule has been stated by a leading treatise as follows:

> A properly filed proof of claim is prima facie evidence of the validity
> and amount of the claim.  The party objecting to the proof of claim has the

> burden of going forward and introducing evidence sufficient to rebut the
> presumption of validity.  Such evidence must be sufficient to demonstrate
> a true dispute and must have probative force equal to the contents of the
> claim.  Upon introduction of sufficient evidence by the objecting party,
> the burden of proof will fall upon whichever party would bear that burden
> outside of bankruptcy.  In most cases, the burden of proof will have to be
> met by the claimant by a preponderance of the evidence. The burdens of
> proof in bankruptcy cases should be applied in the same manner as they
> would be under nonbankruptcy law in a nonbankruptcy forum, since
> the burdens are a substantive aspect of the claim.

*Collier on Bankruptcy*, ¶3001.9[2] (15th ed. rev. 2006).

The court finds that the objecting parties have demonstrated a true dispute, leaving the claimant with the burden of proof.

It is the law of this case that INA is not entitled to reimbursement of legal fees and expenses incurred in connection with the Union Station Project litigation after May 16, 1988. *See, Ins. Co. of N. Am. v. Sullivan,* 333 B.R. 55, 68 (D. Md. 2005).  By redacting the description of the legal services from its Exhibit No. 253 that contains the invoices of the law firm of Smith, Somerville & Case that are in issue, INA made it impossible for the court to reach any informed conclusion based on the invoices other than the fact that the bills were rendered and paid.  Based on the record, and in particular the testimony of Mr. England, the court finds that INA is seeking reimbursement in some measure for legal fees incurred in connection with the Union Station Project litigation for the period after May 16, 1988, to which it is not entitled.

The Trustee urges that the entire reimbursement claim of INA for legal fees and expenses listed above was related and should be disallowed, because INA included within the claim expenses that were incurred in connection with the Union Station Project litigation.  The court is invited to hold that the virus of wrongfully included charges infects the entire application.  INA's presentation fell far short of what the court would look for in the ordinary fee application.  At the same time, for the reasons discussed earlier, the court is unwilling to hold INA to the standard of an applicant for an administrative expense.  Added to this mix is the Trustee's statement that a great percentage of the legal fees and expenses has been identified and effectively agreed upon. Where does that agreement begin and end?  On April 20, 2006, well after the conclusion of trial, INA requested the court to take judicial notice of the Watt, Tieder, Hoffar & FitzGerald fee

-19-

application and its detailed invoices attached to the fee application.  The court finds that the applications and the supporting documents are not proper subjects of judicial notice.

Based on the evidence presented, the court will allow the Andrews Air Force Base, Walker House and Landover Projects' legal fees and expenses in their entirety together with the pre-petition legal fees related to the Union Station Project litigation.  The court will allow the Watt, Tieder, Hoffar & FitzGerald pre-petition fees in full.  The court will allow 65% of the Union Station Project "Non-CAB" fees and expenses.  The court is mindful that this is an estimate at best, but is the best that it can do in the light of the record.

The parties shall cooperate in the presentation of the form of a proposed order, without prejudice to the right to contest any part of the order on appeal.

cc:    Office of the US Trustee
       6305 Ivy Lane
       Suite 600
       Greenbelt, MD 20770

       Jeffrey L. Tarkenton, Esq.
       Andrea K. Short, Esq.
       Womble, Carlyle *et al.*
       1401 Eye St., N.W., Seventh Floor
       Washington, D.C. 20005

       William B. Sullivan. Esq.
       P.O. Drawer 84
       Winston-Salem, NC 27104

       Craig Palik, Esq.
       McNamee, Hosea *et al.*
       6411 Ivy Lane, Ste. 200
       Greenbelt, MD 20770

       Gina M. Petro, Esq.
       Danielle M. Varnell, Esq.
       David C. Romm, Esq.
       Winston & Strawn LLP
       1400 L Street, N.W.
       Washington, D.C. 20005

**End of Memorandum of Decision**